UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES KING, D.O.,

       Plaintiff,                    CIVIL ACTION NO. 09-13761

       vs.                         DISTRICT JUDGE JOHN FEIKENS

PENNSYLVANIA LIFE            MAGISTRATE JUDGE MARK A. RANDON
INSURANCE COMPANY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT # 7)**

**I.  INTRODUCTION**

Presently before the Court is Defendant Pennsylvania Life Insurance Company's (Penn Life) motion for summary judgment (Dkt # 7).  On January 13, 2010, this motion was referred (Dkt # 13) pursuant to 28 U.S.C. § 636 (B)(1)(B) for a Report and Recommendation.  For the reasons stated below, it is **RECOMMENDED** that Penn Life's motion for summary judgment be **GRANTED** and that Plaintiff Charles King, D.O.'s (Dr. King) Complaint be dismissed, with prejudice.

**II.  DISCUSSION**

*A.  Factual Background*

The facts in this case are largely undisputed.  Dr. King practiced as an osteopathic surgeon for a number of years. On October 1, 1976, Dr. King submitted an application for disability income insurance to Massachusetts Indemnity and Life Insurance Company (Mass

Life) [Insurance Application, dated Oct. 1, 1976; Defendant's Exhibit A.] The Policy provided insurance against disability caused by "accidental bodily injury" or by "sickness."

> [Mass Life] DOES HEREBY INSURE the person named in the Policy Schedule on Page 3 for a disability income (set forth in the Policy Schedule and herein called The Monthly Income) in the event of disability *which results from **accidental bodily injury*** sustained while this policy is in force or in the event of disability *which results from **sickness*** which first manifests itself while this policy is in force, to the extent herein provided and subject to the exceptions and other provisions contained herein. [Policy; Defendant's Exhibit B (emphasis added).]

Under the Policy, benefits for a disability stemming from an "accidental bodily injury" were payable throughout the insured's life, whereas benefits for a disability arising from "sickness" ended at age 65. The Policy did not define "accidental bodily injury" or "sickness." As discussed in greater detail below, the termination of disability benefits at age 65 forms the basis of this litigation. Put another way, the primary dispute in this case revolves around whether Dr. King was disabled due to an "accidental bodily injury" (for which he would be entitled to lifetime disability benefits) or whether Dr. King was disabled due to "sickness" (for which he would be entitled to benefits only until age 65).

On December 9, 1977, Dr. King suffered a stroke – which is also known in the medical community as a cerebral vascular accident (or CVA for short) – sitting on a chair lift while skiing in Alta, Utah. According to the medical records from the hospital where Dr. King was admitted:

> This patient was skiing yesterday [12/8/1977]. He fell in the snow, and noted some numbness in the right upper extremities following this fall. He did not seem to be injured, however. The numbness persisted for 15-20 minutes. He was examined on the ski slope at the time of this episode by a fellow physician [John Schriner, D.O.]

> Patient spent a good evening and night prior to his admission. On the day of admission, he made one ski run without difficulty. On the return ride up the ski slope in a chair lift, he once again complained of numbness in his right upper extremity. Almost immediately, he developed a marked paralysis involving the right face, arm, and leg. His speech did not seem to be much impaired, however. He was brought to the Emergency Room of this hospital. A CT scan was done revealing a small lesion in the region of the left insula. He is being admitted to the hospital for further observation and treatment, as indicated. [Report of Wayne M. Hebertson, M.D., dated Dec. 9, 1977; Defendant's Ex. C.]

On January 6, 1978, Dr. King submitted a claim for disability benefits under the Policy with Mass Life. [Statement of Claim, dated Jan. 6, 1978, Defendant's Ex. D.] On the claim form, there were two separate sections to be filled out – one if the claimed disability was due to sickness, and one if the claimed disability was due to accident. Dr. King answered the questions set forth under the heading, "IF DISABILITY DUE TO SICKNESS" and left unanswered the questions under the heading, "IF DISABILITY DUE TO ACCIDENT." [Statement of Claim, dated Jan. 6, 1978; Defendant's Ex. D.]

Defendant claims that Dr. King crossed out the portion of the Statement of Claim required to be answered if disability was due to accident. [Defendant's Brief, p. 3.] Dr. King responds that he did not cross out the "accident" portion of the Statement of Claim; rather, Dr. King states that the Statement of Claim was provided to him by Mass Life with that section already crossed out. [Plaintiff's Response, p. 5; Affidavit of Dr. King; Plaintiff's Ex. D.] It is undisputed that for "nature of illness," the Statement of Claim signed by Dr. King listed "sickness," and also listed the "date of first symptoms" as "12/9/77" (*i.e.*, the day Dr. King suffered his stroke, not the day he fell in the snow, which was 12/8/77). *Id.* On the attached attending physician report, Dr. King's doctor wrote "intracerebral hemorrhage" as the "primary

diagnosis causing disability" and when asked to identify the disability if "due to sickness," he wrote "see above," and put a line through the space for a response if "due to accident." *Id.*

Mass Life began paying disability benefits to Dr. King after receiving his Statement of Claim in January 1978. Under the terms of the Policy, King received a monthly benefit of $2,500 because he was totally disabled, which the Policy defined as the "complete inability to engage in the Insured's regular occupation." [Policy, Policy Amendment Rider; Defendant's Ex. B at 9.] While over time, Dr. King was able to resume the practice of medicine (as a radiologist), he was never able to perform surgery – his "regular occupation" – because of the limited use of his right hand due to his stroke. [Ltr. from Dr. King to Mass Life, dated July 15, 1978; Defendant's Ex. E (referring to his stroke as "my illness" and explaining that he is unable to perform surgery due to his limited use of his right hand).]

Some time after it began paying benefits, Mass Life conducted a further investigation into the nature of Dr. King's disability. On November 10, 1978, Jack Rayner – a Mass Life agent – recognized that Dr. King had fallen in the snow the day before his stroke was diagnosed, and that he immediately "felt some discomfort in his arm and shoulder." [Rayner report to Mick Orend, dated Nov. 10, 1978; Plaintiff's Ex. F]. Subsequent to the Rayner report, Mass Life requested a narrative description of the observations of John Schriner, D.O., Dr. King's friend who had been skiing with him on December 8 and December 9, 1977. Dr. Schriner's response to Mass Life referred to Dr. King's "injuries," suffered in connection with an "accident." [Dr. Schriner Ltr. dated March 12, 1979; Plaintiff's Ex. G.] To quote Dr. Schriner's narrative: "Prior to <u>his injury</u> [Dr. King] was assumed to be in excellent health and he and I had been skiing for at

least one to two days prior to the accident." *Id*. (handwritten underlining of the phrase "his injury" from the original contained in Mass Life's files).

Following Mass Life's receipt of Dr. Schriner's narrative report, a representative of Mass Life – Mick Orend – handwrote a memo to Dr. King's file, dated April 16, 1979, in which stated the following:

> [Mass Life Representative], Larry Cattani and I discussed the file. We agreed that even if there were a question of accident vs. sickness – which there doesn't appear to be – that question is not particularly pressing, since benefits are payable for sickness to age 65 for qualifying claims (2006 in this case).
>
> Larry suggested Dr. Larcom review the case re: when and if we need an IME. [Orend Memo, dated April 16, 1979; Plaintiff's Ex. H.]

The question of whether Dr. King's disability was due to an "accident" – as opposed to a "sickness" – is further discussed by Mass Life representatives in a "Claim Department Medical Referral Form" authored the day after the Orend Memo, as a joint project of Mr. Orend and Dr. Larcom. [Medical Referral Form, dated April 17, 1979; Plaintiff's Ex. I.]  Labeled "<u>Very Important</u>," (emphasis in original), this document states, in pertinent part, the following:

Age at outset 36 ... life expectancy – good

\*\*\*

> Dr. Schriner's letter [of] 12 March 79 <u>can</u> be very significant [Emphasis in original] ... Nowhere else in the records (hospital, the Insured's statements...etc) is the word "<u>injury</u>" used except in Dr. Schriner's letter. Medically, "injury" can be used to refer to tissue damage as a result of a sickness <u>but</u> in Dr. Schriners (sic) letter, the term it is (sic) used a little bit out of context. Don't forget this man had a fall sometime prior to his onset! [Emphasis in original]

> I feel we must clarify the meaning of injury as used by Dr.
> Schriner. ? ski patrol reports. ? ambulance & ER reports? follow-
> up letter to Dr. Schriner...

Subsequently, on June 25, 1979, Dr. Larcom wrote to Dr. Schriner requesting a clarification of Dr. Schriner's "double reference to injury," as contained in Dr. Schriner's March 12, 1979 letter. [Ltr. from Dr. Larcom to Dr. Schriner, dated June 25, 1979; Plaintiff's Ex. J.] Dr. Schriner's response, dated July 10, 1979, set forth his opinion that he "consider[ed] [Dr. King's] vascular accident...an injury to his brain, and [was] not in any way [intending to reflect] that this was as a result of trauma." [Dr. Schriner Response to Dr. Larcom, dated July 10, 1979; Plaintiff's Ex. K.] Dr. Schriner's letter went on to say that, "[i]n reality, there was no trauma involved in [Dr. King's] vascular accident." *Id.*

The record also contains other documents of note. On or about August 21, 1987, Dr. King requested that Mass Life send him a letter describing his benefits so that he could give the letter to a loan officer from a bank he was trying to obtain a loan from. [Mass Life Inter-Office Correspondence, dated Aug. 21, 1987; Defendant's Ex. F.] Mass Life complied with Dr. King's request and sent him the following letter, describing his benefits under the Policy:

> Please let this letter serve to confirm that the monthly disability
> benefit of your policy is $2,500.00, and that those benefits will
> continue until your 65th birthday. [Ltr. From Mass Life to Dr.
> King, dated Aug. 21, 1987; Defendant's Ex. G.]

There is no evidence indicating that Dr. King objected to Mass Life's statement in 1987 that his benefits would expire on his 65th birthday.

Some time thereafter, Defendant Penn Life acquired Dr. King's Policy from Mass Life and assumed the responsibility for paying disability benefits under the Policy. Penn Life continued to pay Dr. King disability benefits under the Policy until May 2006. At that time,

Penn Life sent Dr. King a letter advising him that his "monthly benefits should have ceased on 03/27/06," which was Dr. King's 65th birthday. [Ltr. From Penn Life to Dr. King, dated May 16, 2006; Defendant's Ex. H.] This letter explained that:

> Your policy provides benefits when Sickness results in Total Disability. The monthly income under this provision of your policy is payable until your 65th birthday. Please be advised that monthly benefits should have ceased on 03/27/06.
>
> * * *
>
> A review of our records indicates that Total Disability benefits were issued on 04/03/06 and 05/01/06 in error, resulting in an overpayment of $4,416.66 after your 65th birthday. *Id.*

On September 11, 2009, Dr. King filed an action in the Genesee County Circuit Court against Penn Life, seeking, among other things, a declaratory judgment that his stroke was an "accident." Penn Life removed the case to this Court based on diversity jurisdiction on September 23, 2009.

On November 17, 2009, Penn Life filed the motion for summary judgment now before the Court, arguing that Dr. King's stroke is not an "accidental bodily injury," as a matter of law. As part of this argument, Penn Life avers that the language of the Policy is plain and unambiguous and that the there is no genuine issue of fact that Dr. King's stroke was caused by anything other than an internal biological event (*i.e.* a "sickness").

Dr. King's response to Penn Life's motion raises two primary arguments: (1) that there is a genuine issue of material fact as to whether Dr. King's fall in the snow (which could be construed as an "accidental bodily injury" under the Policy) on December 8, 1977 (the day

-7-

before his stroke) precipitated his stroke[1]; alternatively, (2) that the Policy is ambiguous as to whether a stroke (or, in the medical parlance, a "cerebral vascular *accident*") is an "accidental bodily injury." Dr. King expounds on his second argument by averring that the interpretation of an ambiguous contract term is a question of fact, thus precluding summary judgment.

### B. *Analysis*

#### 1. **Standard for Summary Judgment**

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party, here Dr. King. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a

---

[1] In support of this argument, Dr. King submits an Affidavit of Christopher Sweet, M.D., a fellow radiologist. [Dr. Sweet Affidavit, dated Dec. 9, 2009; Plaintiff's Ex. L]. Dr. Sweet states in his Affidavit that he has reviewed Dr. King's medical records from the 1970s (including CT scans) and opines that Dr. King's stroke first manifested itself on December 8, 1977 – after Dr. King fell in the snow while skiing.

> situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### 2. Construction Of Insurance Contracts

A federal court exercising diversity jurisdiction applies the law of the forum state. *See Uhl* v. *Komatsu Forklift Co., Ltd.,* 512 F.3d 294, 302 (6th Cir. 2008). In so doing, the Court is instructed to rule in accordance with controlling decisions of the Michigan Supreme Court. *Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir. 1996). The Michigan Supreme Court has held that a court should examine the language of an insurance policy and interpret its terms in accordance with well-established principles of construction. *See Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 111 (1999). A fundamental rule of construction is that the "insurance contract must be enforced in accordance with its terms." *Henderson v. State Farm*, 460 Mich. 348, 354 (1999). "[T]he court may not read ambiguity into a policy where none exists. Where ambiguity is found, however, the court must construe the term in the manner most favorable to the insured." *CTSC Boston v. Cont'l Ins. Co.*, 25 Fed. Appx. 320, 324 (6th Cir. 2001) (citations omitted). Moreover, ambiguity only exists where a provision of the contract is susceptible to different reasonable interpretations. *Id.* The

construction and interpretation of an insurance contract is a question of law, for the Court to determine. *See Morley v. Auto. Club of Mich.*, 458 Mich. 459, 465 (1998).

An insurance policy is not rendered ambiguous just because it does not define a relevant term. *See Henderson,* 460 Mich. at 354; *Doeren Mayhew & Co., P.E.* v. *CPA Mut. Ins. Co. of Am. Risk Retention Group,* 633 F. Supp. 2d 434 (E.D. Mich. 2007) (under Michigan law, fact that policy does not define relevant term does not render policy ambiguous). If a term is not defined in the insurance policy, the Court must interpret it according to its commonly used meaning, taking into account the reasonable expectations of the parties. *See Prestige*, 99 F.3d at 1350 (citing *Anderson Development Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1131 (6th Cir.1995)). In other words, "the policy language in the insurance contract is to be accorded its commonly used meaning unless it is apparent from reading the instrument as a whole that a different or special meaning was intended." *Prestige*, 99 F.3d at 1350.

### 3. The Policy Is Not Ambiguous

Although "accidental bodily injury" is not defined in the Policy, the Michigan Supreme Court has held that these are words of common understanding, and thus can be given their ordinary meaning. *See Nehra* v. *Provident Life & Accident Ins. Co.,* 454 Mich. 110, 117 (1997). Indeed, *Nehra* is quite factually analogous to the present case. In *Nehra*, a dentist (the plaintiff) received disability insurance benefits as a result of being disabled by carpal tunnel syndrome. The disability policy at issue in *Nehra* insured against disability due to "injury" and due to "sickness." The term "injury" was defined in the *Nehra* policy as "accidental bodily injuries" – the policy did not further define "accidental bodily injuries." *Nehra*, 454 Mich. at 113. As in the present case, benefits for disability stemming from an "injury" were to be paid throughout the

insured's lifetime, whereas benefits for a disability arising from "sickness" ended at age 65. *Id.* When the plaintiff in *Nehra* turned 65, the defendant stopped paying benefits; the plaintiff sued, arguing that his carpal tunnel syndrome could be characterized as an "injury" and that the term "accidental bodily injur[y]" was ambiguous. The Michigan Supreme Court disagreed with the plaintiff, held that these words were not ambiguous and granted summary disposition to the defendant. This Court finds no reason to depart from the *Nehra* holding and finds that, as a matter of law, the term "accidental bodily injury" is not ambiguous, but rather is comprised of words that are of common understanding.

Turning now to what "accidental bodily injuries" means, Black's Law Dictionary defines "accidental injury" as "[a]n injury resulting from *external,* violent, and unanticipated causes; esp., *bodily injury* caused by some *external* force or agency operating contrary to a person's intentions, unexpectedly, and not according to the usual order of events." Black's Law Dictionary (7th ed. 1999) (emphasis added). Black's defines "bodily injury" as "[p]hysical damage to a person's body." *Id.*

Furthermore, a leading commentator on insurance law has explained that "[i]nfirmity or other result of the normal aging process is not an accident or accidental, *nor are clearly biological, medical conditions, despite the fact that they are known as an "accident" in the medical community.*" 10 *Couch on Insurance* § 139.14 (3d ed. 1997) (emphasis added). As *Couch* has explained:

> The simplest example is that some biological conditions have been labeled as "accidents," yet are clearly not accidents of the type contemplated by a policy of accident insurance. *A "cerebrovascular" accident, for example, is a stroke, and rarely meets the definition of an accident for purposes of insurance law*

> *unless some external trauma can be shown to have produced* it.
> [*Id.* at § 141:4 (emphasis added).]

Similarly, another leading commentator on insurance has explained that:

> [T]here is a difference in interpretation of medical causation and legal causation. From the point of view of the physician, anything that occurs suddenly may be considered an accident. Therefore, if a particle in a blood stream floats and lodges in a lung or in a coronary artery, that is an accident; the development of a thrombosis in place is not. *The bursting of a blood vessel in the brain is a cerebral accident;* an occlusion resulting from atherosclerosis or its inadequacy from arteriosclerosis is not. *None of these things constitutes a legal accident unless trauma causes the clot to float or acts on a predisposing medical condition so as to produce disability or death.* [32 Eric Mills Holmes & Mark S. Rhodes, *Holmes' Appleman on Insurance* § 188.02[A] (2d ed. 1996 & Supp. 2009) (emphasis added).]

Accordingly, Dr. King's argument that the term "accidental bodily injury" is ambiguous is not well taken. The plain and ordinary meaning of "accidental bodily injury" is an injury caused by external trauma to the body, not by sickness or disease. Furthermore, Dr. King's argument that his "cerebral vascular *accident*" falls within the Policy's definition of "accidental bodily injury" (presumably because both phrases use the term "accident") is also not well taken. The fact that a stroke's technical medical definition uses the term "accident" does not make it an accident of the type contemplated by an insurance policy. Thus, in order to avoid summary judgment, Dr. King must show that there is a genuine issue of material fact that some external trauma precipitated his stroke on December 9, 1977.

### 3. There Is No Genuine Issue Of Fact That Dr. King Suffered An "Accident"

The Court now turns to the question of is there a genuine issue of material fact as to whether Dr. King suffered some external trauma (such as his fall on December 8, 1977) which precipitated his stroke the following day. The Court finds that there is not a genuine issue of material fact. In this case, both Dr. King and his former colleague Dr. Schriner, themselves physicians, have *admitted* that there was no external trauma involved. Indeed, Dr. Schriner, who was with Dr. King at the time he suffered his stroke, told Mass Life that:

> [Dr. King's] vascular accident was an injury to his brain, and I am not in any way reflecting that this was as a result of trauma. In reality, there was **no trauma involved** in his vascular accident. [Ltr. from Dr. Schriner to Mass Life, dated July 16, 1979; Defendant's Ex. M (emphasis added).]

Similarly, Dr. King himself admitted in an interview with Mass Life that "*there wasn't actually an accident involved. We (Mass Life) changed the word **accident** to **incident**.*" [Excerpt from Report on Dr. King; Defendant's Ex. N (emphasis added).] Furthermore, the Statement of Claim signed by Dr. King listed "sickness" as the nature of his illness and further listed his "[d]ate of first symptoms" as "12/9/77" (*i.e.*, the day of his stroke, not the day of his fall, which was 12/8/77).

Indeed, this case is similar to *Brock v. Zurich American Ins. Co.*, 2009 WL 2244610 *4-5 (E.D. Tenn., July 27, 2009). In *Brock*, the plaintiff suffered a fall approximately one week before having a stroke. The plaintiff sought insurance benefits under an accident insurance policy. The defendant denied benefits, contending that the plaintiff's stroke was not the result of an "accident;" the plaintiff sued and the defendant filed a motion for summary judgment, arguing (as in the present case) that there was no genuine issue of material fact that the plaintiff's fall

precipitated his stroke a week later. The plaintiff responded to the defendant's motion with a letter from a physician, who opined (as Dr. Sweet does in the present case) that the plaintiff's fall was most likely the cause of his stroke. The court disregarded the physician's opinion, and found no genuine issue of material fact that the plaintiff's stroke was precipitated by the plaintiff's prior fall.[2] Thus, summary judgment was granted for the defendant.

The case of *Gay v. Stonebridge Life Ins. Co.*, 585 F. Supp. 2d 171 (D. Mass. 2008) is also instructive, when contrasted with Dr. King's case. In *Gay*, the decedent suffered contemporaneous stroke, fall and skull fracture. The plaintiff (the decedent's husband) sought to recover life insurance benefits under a policy which insured against bodily injury caused by "accident." As in the present case, the dispute in *Gay* revolved around whether the decedent's stroke caused her to fall (a "sickness") or whether the decedent's fall caused her to have a stroke (an "accident"). The court in *Gay* denied summary judgment to the defendant and found that there was a genuine issue of material fact for trial. The court based this ruling on the fact that the coroner could not rule out the possibility that the decedent's head trauma was a result of a trip and fall, rather than a stroke. The court in *Gay* also noted that the plaintiff submitted a letter from a board certified neurologist, suggesting that the unfortunate demise of the decedent was "quite consistent with primary trauma from a trip and fall." *Gay*, 585 F. Supp. 2d at 174.

---

[2] The court in *Brock* also noted that the plaintiff had significant risk factors which would have contributed to the plaintiff having a stroke. Although not dispositive in this case, it bears noting that Dr. King's father died of a stroke at age 48 [Disability Application; Defendant's Ex. A at 3] and that Dr. King has been diagnosed with an A.V. malformation [Rayner report; Plaintiff's Ex. F.] An A.V. malformation (or arteriovenous malformation) is a congenital defect which makes the brain's vascular structures susceptible to rupture. *See Christopher v. Florida*, 449 F.3d 1360 (11th Cir. 2006). Both the fact that Dr. King's father died of a stroke at a young age and the fact that Dr. King has an A.V. malformation suggest that Dr. King has significant risk factors for having a stroke, similar to the plaintiff in *Brock*.

The present case, however, is quite distinguishable from *Gay* in that the decedent in *Gay* suffered a stroke, fall and skull fracture *simultaneously*. Here, Dr. King's fall occurred the day before he suffered his stroke, and there simply is no evidence, medical or otherwise, (from the 1970s) in the record indicating that Dr. King's fall on December 8, 1977 had anything to do with his stroke on December 9, 1977 – or that Dr. King believed the events were even remotely related. The Court recognizes that Dr. King presents an Affidavit of a fellow radiologist (Dr. Sweet), which opines that Dr. King's fall precipitated his stroke. However, the Court finds that Dr. Sweet's Affidavit is similar to the physician opinion rejected by the Court in *Brock*.[3] Dr. King has simply failed to proffer sufficient evidence to convince the Court that a genuine issue of material fact exists for trial.

In sum, along the continuum of "stroke causing fall" vs. "fall causing stroke" fact patterns, the present case appears to fall somewhere between *Brock* and *Gay*. However, the Court finds that the present case is much more similar to *Brock*. As such, the Court finds that Dr. King has failed to present a genuine issue of material fact that he suffered some kind of external trauma (fall/head injury/etc), which then caused him to have a stroke. Accordingly, the undersigned recommends that Penn Life's motion for summary judgment be granted.

## IV. CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that Penn Life's motion for summary judgment be **GRANTED**, and that Dr. King's Complaint be dismissed, with prejudice.

---

[3] The non-eyewitness affidavit of Dr. Sweet (prepared some 30 years after plaintiff's stroke) is in stark contrast to the opinion of Dr. Shriner, who stated unequivocally that there was no trauma involved in Plaintiff's stroke (based on his contemporaneous observation of the events).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated: February 8, 2010

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, February 8, 2010, by electronic and/or ordinary mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*