UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Charles E. King,

      Plaintiff,

v.

Pennsylvania Life Insurance Company,

      Defendant.

_____/

Case No. 09-13761

Honorable Nancy G. Edmunds

## ORDER AND OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [68]

In this almost-four-year-old case, Plaintiff Charles A. King, D.O., seeks additional disability benefits from his disability income insurance policy with Defendant Pennsylvania Life Insurance Company. Defendant does not dispute that Plaintiff "was and is totally disabled" after he suffered a stroke in 1977.[1] The case's central issue is whether an "accidental bodily injury," stemming from a fall Plaintiff took while skiing, caused Plaintiff's total disability, entitling him to lifetime benefits, or whether "sickness" caused the stroke, entitling him to benefits until age 65.

A district judge granted Defendant's initial motion for summary judgment. Plaintiff thereafter appealed and the Sixth Circuit remanded, finding an issue of fact as to the cause of the accident. After remand, the parties engaged in discovery. Defendant has now filed this second motion for summary judgment. Defendant again argues that there is no issue of fact in this case. Defendant also argues, for the first time, that Michigan's breach of contract statute of limitations bars Plaintiff's claim.

_____

[1] Dkt. 7, Def.'s 1st Mot. for Summ. J. at 6.

Because the Court finds that Defendant has waived its statute of limitations and laches affirmative defenses and because an issue of fact exists as to what caused Plaintiff's stroke and total disability, the Court DENIES Defendant's motion for summary judgment.

## I.    Facts

On November 23, 1976, Massachusetts Indemnity and Life Insurance Company ("Mass Life," Defendant's predecessor-in-interest) issued Plaintiff a disability income insurance policy. The policy gave Plaintiff monetary insurance benefits "in the event of disability which results from accidental bodily injury sustained while this policy is in force or in the event of disability which results from sickness which firsts manifests itself while this policy is in force." (Dkt. 68, Def.'s 2d Mot. for Summ. J., Ex. A, Policy, at 1.) At the time, Plaintiff was a thirty-five-year-old practicing osteopathic surgeon living in the Flint, Michigan area. (*Id.*, Ex. B, Curriculum Vitae of Charles King.) As part of the application for the policy, Plaintiff described his medical history, including providing the note that his father died of a stroke at age 48. (*Id.*; Ex. A., Policy, at 11.)[2] Under the policy, payments for total disability caused by "sickness" are payable until the insured's sixty-fifth birthday; payments for total disability due to an "accident" are payable for the Plaintiff's entire life. (Policy, at 3.) The Policy does not define "accident" or "sickness." (*Id.*, at 2.) Plaintiff had a stroke in 1977, causing total disability; the case's central issue is what caused the stroke.

### A.  Facts Immediately Surrounding Plaintiff's Stroke

---

[2] Plaintiff indicates that Charles Avila King, Plaintiff's father, died of medullary thrombosis (blood clot) in 1955. (Dkt. 72, Pl.'s Resp. to Def.'s 2d Mot. for Summ. J., Ex. 3, Death Certificate; Def.'s 2d Mot. for Summ. J., Ex. C, Charles King Dep. at 100.)

On December 8, 1977, Plaintiff "fell in the snow" while skiing in Alta, Utah with his friend and colleague Dr. John L. Schriner, a fellow physician. *King v. Pennsylvania Life Ins. Co.*, 470 F. App'x 439, 440 (6th Cir. 2012); (*see also* Def.'s 2d Mot. for Summ. J., Ex. C, Charles King Dep. at 27, 28, 32; Ex. K, Jon L. Schriner Dep. at 50.) Plaintiff fell to the right and hit the right side of his head. (King Dep. at 32.) He stayed on the ground for ten to fifteen minutes, experienced numbness in his right shoulder, and noted that his "right arm wouldn't move like it normally did." (*Id.*) Plaintiff had not experienced any unusual symptoms before the fall, and resumed skiing after the fall. (*Id.*, at 31, 33, 34.) Dr. Schriner did not witness the fall itself but was "impatient" while waiting for Plaintiff farther down the mountain while Plaintiff collected himself. (Schriner Dep. at 51.) When the two reconnected, Dr. Schriner asked Plaintiff multiple times whether he was "okay" and if he wanted to continue skiing; Plaintiff "raised his arm in a manner and kind of shook it" but the two continued skiing. (Schriner Dep. at 51, 52; King Dep. at 34.) Plaintiff had a headache when he went to bed that night, but he assumed it was because of the altitude. (King Dep. at 39.)

The next day, December 9, 1977, Plaintiff suffered a stroke (a cerebral vascular accident)[3] while riding up the chair lift with Dr. Schriner. Plaintiff went to St. Mark's Hospital in Salt Lake City, Utah, and Dr. Wayne M. Hebertson, M.D., examined him. In his report the day of the stroke, Dr. Hebertson noted that Plaintiff had "developed a marked paralysis involving the right face, arm, and leg" but "his speech did not seem impaired." (Def.'s 2d Mot. for Summ. J., Ex. F, Report of Wayne M. Heberston, M.D., at 2.) Dr. Hebertson stated

---

[3] Dr. Christopher Sweet, a neuro-radiologist, who offered his opinion regarding the cause of Plaintiff's stroke, testified in his deposition that a cerebral vascular accident "is any type of traumatic injury to the brain." (Def.'s 2d Mot. for Summ. J., Ex. L, Christopher Sweet Dep. at 58-59.)

3

that Plaintiff had "a small lesion in the region of the left insula," and he formed the "impression" that Plaintiff had: "acute intracerebral bleeding on the left, cause undetermined." (*Id.*, at 3.) The doctors in Utah that treated Plaintiff told him that they could see no reason for the stroke; for example, Plaintiff asserts that no one told him his angiogram reflected an AV malformation[4], and no one said Plaintiff had a berry aneurysm.[5] (King Dep. at 47-49.)

There is some disagreement regarding the chain of events between Plaintiff and Dr. Shriner. For example, Dr. Schriner claims that Plaintiff fell the same day he had the stroke (Schriner Dep. at 50, 55, 56) whereas Plaintiff says the fall occurred the day before the stroke (King Dep. at 27, 39, 40.) In addition, Plaintiff was not told that he had a berry aneurysm, but Dr. Schriner recalls a neurologist in Utah telling him that Plaintiff had a berry aneurysm. (King Dep. at 27-49; Schriner Dep. at 66-67.)

### B. Post-Stroke Treatment and Plaintiff's Initial Claim

Plaintiff remained in the hospital for several days. He eventually flew home to Michigan and Dr. Gary W. Roat examined him on December 22, 1977; Dr. Roat completed a physician report and determined that Plaintiff "suffered an 'intracerebral hemorrhage' and was totally disabled as a result." (Def.'s 2d Mot. for Summ. J., Ex. G, Statement of Claim

---

[4] An AVM, or arteriovenous malformal is an "abnormal tangle of blood vessels." An AVY typically dates to birth. If a case of AVM is serious, "the blood vessels rupture, causing bleeding in the brain (hemorrhage)." Mayo Clinc, Brain AVM, available at http://www.mayoclinic.com/health/brain-avm/DS01126 (last visited July 31, 2013).

[5] An aneurysm is "a weak area in the wall of a blood vessel that causes the blood vessel to bulge or balloon out." The most common type of is called a berry aneurysm; these are more common in adults and "multiple berry aneurysms are passed down through families more often than other types of aneurysms." Aneurysm in the Brain, MedlinePlus: A service of the U.S. Nat'l Library of Medicine, Nat'l Institutes of Health, available at http://www.nlm.nih.gov/medlineplus/ency/article/001414.htm (last visited July 31, 2013).

at 1, Roat Report at 2; *King*, 470 F. App'x at 440.) On the report's third question relating to the diagnosis, there is a line drawn through the "due to accident" section, and Dr. Roat wrote "see above" in the space for the "due to sickness" section. (*Id.*) There is dispute about who drew the line through the accident section. *King*, 470 F. App'x at 440. Plaintiff contends that Mass Life drew that line before giving the report to Dr. Roat; Defendant assumes that Dr. Roat drew the line himself. *King*, 470 F. App'x at 440.

Plaintiff submitted a "Statement of Claim" form, with the physician's report attached, to Mass Life on January 6, 1978. (Statement of Claim & Roat Report, at 1-2.) According to Plaintiff, Mass Life completed the typed portion of the claim form while his wife at the time completed the handwritten portion of the claim. (King Dep. at 52, 53.) The statement of claims has two mutually exclusive sections for the claimant to complete. One is to be completed "IF DISABILITY DUE TO SICKNESS" and the other is to be completed "IF DISABILITY DUE TO ACCIDENT." (Statement of Claim at 1. (emphasis in original.)) Plaintiff claims that the "IF DISABILITY DUE TO ACCIDENT" section was already crossed out by hand "when we got the form." (King Dep. at 56.)  Under the "IF DISABILITY DUE TO SICKNESS" section, "sickness" was typed as "Nature of illness" and "12/9/77" was typed in as the "Date of first symptoms." (Statement of Claim at 1.) Finding the claim accurate, Plaintiff signed the form. (*Id.*; King Dep. at 56.) In January, 1978, Mass Life began paying a monthly disability payment of $2,500 to Plaintiff because he was totally disabled.[6]

---

[6] After his stroke, Plaintiff was able to resume practicing medicine as a radiologist, but was never able to perform surgeries because he had limited use of his right hand. (Curriculum Vitae of Charles King); *King*, 470 F. App'x at 440.

C.   **Update of Disability by Plaintiff; Rayner Report; Description of Events by Dr. Schriner**

On July 15, 1978, Plaintiff sent a letter to Mass Life giving an update on his disability, his treatment, and comparing his past activities as a general surgeon to his current tasks. (Def.'s 2d Mot. Summ. J., Ex. H, Ltr. from Charles King, D.O., to Mass Life.) His letter stated:

> As you know, I am receiving disability benefits from your company since suffering a stroke in December 1977.
>
> Previous to my illness, I was a practicing general surgeon . . . [my current employment] requires no manual dexterity from me, as it is a "behind the desk" job.
>
> I am still unable to perform surgery (for which I am insured) because of weakness, lack of coordination, and loss of motor control of my right arm and hand.

On November 10, 1978, Mass Life Agency Jack Rayner submitted a report to representative Mick Orend after visiting with Plaintiff.  (Dkt. 11, Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. F, Nov. 7, 1978 Jack Rayner Report.) The report noted that Plaintiff was totally disabled "with a diagnosis of intracerebral hemorrhage." (*Id.* at 1; *King*, 470 F. App'x at 441.) The report described the incident on the ski slope: it stated that Plaintiff "fell at the bottom" of the ski slope and "experienced discomfort in his arm and shoulder" when he got up from the fall. *(*Rayner Report at 1.) Plaintiff continued skiing and "skied better than he'd ever done." (*Id.* at 2.) The report concluded by saying that "Dr. Schriner was the only physician involved prior to the hospital [in Utah]. There, the angiogram showed an A.V. malformation."[7]  (*Id.*) In his deposition, Plaintiff noted that he had never seen a berry

---

[7] When this wording was shown to Dr. Sweet, he did not agree with the statement that "the angiogram showed an AV malformation. (Def.'s 2d Mot. for Summ. J., Ex. L, Christopher

6

aneurysm or AV malformation on "any of the reports, or on any of the radiological studies . . . of his brain" and Plaintiff "did not know where [Rayner] got that." (King Dep. at 99, 100.)

Following up on the Rayner Report, in February, 1979 Mass Life asked Dr. Schriner for his observations from December 8 and 9, 1977.  His March 12, 1979 letter referred to Plaintiff's "injuries" in connection with an "accident;" he stated "[p]rior to his injury, he was assumed to be in excellent health and he and I had been skiing for at least one to two days prior to the accident." (Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. G, Schriner Ltr. to Mass Life, at 1-2.)

Around the same time, Mass Life agents interviewed Plaintiff in order to get authorization to access the ski reports. *King*, 470 F. App'x at 441. In an excerpt from the interview, Plaintiff did not agree with the original wording in the authorization, which referenced a "skiing accident;" Plaintiff "said that there wasn't actually an accident involved. We changed the word accident to incident." (Def.'s 2d Mot. for Summ. J., Ex. D, Excerpt from Pls.' Apr. 22, 1979 Written Interview.) Plaintiff "reviewed the authorization as [Plaintiff and Mass Life agents] had corrected it, signed and dated the authorization." (*Id.*) Plaintiff does not remember this interview. (King Dep. at 62-63.)

### D. Variances and Attempted Clarification of Rayner Report and Dr. Schriner's Description of Events

The discrepancies between the Rayner Report and Dr. Schriner's observations led to additional memorandums regarding Plaintiff's file.  On April 16, 1979, Mass Life representative Mike Orend hand-wrote a note that specifically addressed the accident versus sickness issue:

---

Sweet Dep. at 93-94.)

> Larry Cattani [another Mass Life official] & I discussed this file. We agreed that even if there were a question of accident vs. sickness – which there doesn't appear to be – that question is not particularly pressing, since benefits are payable for sickness to age 65 for qualifying claims (2006 in this case).
> Larry suggested [another doctor] review the case re: when and if we need an IME.

(Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. H, Handwritten note, Apr. 16, 1979, of Mike Orend; *King*, 470 F. App'x at 441.)

Mass Life's review of Dr. Schriner's March 12, 1979 letter of the events surrounding Plaintiff's stroke noted some "very important" issues. (Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. I, Apr. 17, 1979 Claim Department Medical Referral Form.) The form noted that Dr. Schriner's use of the word "injury" could be "very significant" and appeared to be used "a little bit out of context;" the form recommended clarifying "the meaning of injury as used by Dr. Shriner." (*Id.*; *King*, 470 F. App'x at 441.)

As a result, on June 25, 1979, Dr. Rodney Larcom from Mass Life wrote to Dr. Schriner saying that he was "puzzled" by Dr. Schriner's "double reference to injury." (Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. J, June 25, 1979, Dr. Rodney Larcom Ltr.) The Letter continued:

> In our file we have information from the Ski Patrol, complete hospital records, our field representative's personal report and repeated reports from his attending physician. In none of these is there mentioned any specific positive relationship to trauma as a basis for his condition. There is a mention of cerebral insult and I wonder if this is the context of your reference to injury; i.e. cellular injury.

(*Id.*) Dr. Schriner responded on July 16, 1979, stating: "[I] believe this is a matter of semantics when I refer to injury. I consider this vascular accident was an injury to his brain, and I am not in any way reflecting that this was a result of trauma. In reality, there was no

trauma involved in his vascular accident." (Pl.'s Resp. to Def.'s 1st Mot. for Summ. J., Ex. K, Jon Schriner's Resp. Ltr.) Throughout this time, Plaintiff continued to receive disability benefits.

### E. Additional Correspondence between Plaintiff and Mass Life Regarding Disability

On or about August 21, 1987, Plaintiff requested a letter from Mass Life describing his benefits to give to a loan officer. (Def.'s 1st Mot. for Summ. J., Ex. F, Mass Life Inter-Office Corr.) Mass Life responded the same day, August 21, with a letter stating: "Please let this letter serve to confirm that the monthly disability benefit of your policy is $2,500.00, and that those benefits will continue until your 65th birthday." (*Id.*, Ex. G, Ltr. from M. Orend of Mass Life to King.)

Penn Life later acquired Mass Life and continued to pay Plaintiff's benefits until May, 2006.

### F. Termination of Benefits and Correspondence between Plaintiff's Counsel and Defendant

On May 16, 2006, Tara Morris, Claims Advisor at Penn Life, sent Plaintiff a letter noting an overpayment to Plaintiff. (*Id.*, Ex. H, Ltr. from Tara Morris of Penn Life to King, at 1.) The letter stated: "Your policy provides benefits when Sickness results in Total Disability. The monthly income under this provision of your policy is payable until your 65th birthday." (*Id.*)

On June 15, 2006, Plaintiff's counsel sent a response letter to Ms. Morris on behalf of Plaintiff. (*Id.*, Ex. I, Ltr. from José T. Brown to Tara Morris of Penn Life.) The letter stated that he disagreed with the conclusion that Plaintiff had "a sickness that resulted in total

disability," that in fact "he suffered an accident while skiing (hit a tree) . . . [and] as a result of this accident, he developed a brain hemorrhage resulting in a stroke."[8] (*Id.*) Penn Life responded on June 29, 2006. (*Id.*, Ex. J, Ltr. from Danlias F. Howe of Penn Life to José T. Brown.) The letter stated that Penn Life's determination that Plaintiff's disability was caused by sickness was based on "information that your insured provided to us in writing," and would not consider revising the facts of this case. (*Id.* at 2.) The parties exchange similar letters in August, 2008, again disputing the central issue of this case. (*Id.,* Ex. K, Ltr. from José T. Brown to Danlias F. Howe; *Id.,* Ex. L, Ltr. from Danlias F. Howe of Penn life to José T. Brown.)

## II.   Procedural History

### A.   Plaintiff Filed Suit, Removed to Eastern District of Michigan; Defendant's First Motion for Summary Judgment Granted

Plaintiff filed suit on September 10, 2009, in Genesee County Circuit Court; Defendant removed the action to federal court on September 23, 2009. (Dkt. 1, Notice of Removal, Ex. A., Pl.'s Compl.) Plaintiff sought, among other things, a declaratory judgment that his stroke was an "accident." (*Id.* at ¶¶ 25-31.) After Defendant answered the complaint,[9] Defendant filed its first motion for summary judgment. (Dkt. 7, Def.'s 1st Mot. for Summ. J.) In support of its motion, Defendant argued that that the language of the Policy was plain and unambiguous, and there was no dispute that Plaintiff's stroke was caused by sickness, in this case, and internal biological event. (*Id.*; *see also King*, 470 F. App'x at 442; Dkt. 15, Report & Rec. to Grant Def.'s Mot. for Summ. J. at 7.)

---

[8] This appears to be the first and only reference to Plaintiff hitting a tree.
[9] Dkt. 4, Ans. to Compl.

Plaintiff opposed the motion, arguing that there was a genuine issue of material fact as to whether his disability resulted from "accidental bodily injury" or "sickness" and thus, summary judgment would be inappropriate. (Dkt. 11, Pl.'s Resp. to Def.'s 1st Mot. for Summ. J.) Plaintiff argued that (1) there was a genuine issue of material fact as to whether his fall while skiing precipitated his stroke, and alternatively, (2) that the Policy is ambiguous as to whether a stroke, (cerebral vascular accident) is an "accidental bodily injury." (*Id.*; see also Report & Rec. to Grant Def.'s Mot. for Summ. J. at 7-8.)

In support of his first argument, Plaintiff relied on the December 9, 2009 affidavit of Dr. Christopher Sweet, a neuro-radiologist who offered his opinion regarding the cause of Plaintiff's stroke. (*Id.*, Ex. L, Aff. of Christopher Sweet, D.O.) In forming his opinion, Dr. Sweet "reviewed the Complaint of Charles A. King . . . along with CT scans and St. Marks [sic] medical records pertaining to Dr. King's 1977 skiing accident in Alta, Utah, including the December 9, 1977, CT scans." (*Id.* at 1.) The primary focus of the affidavit stated:

> [B]ased upon the information provided to me, as above described, as well as upon my years of education, training, and experience, it is my professional medical opinion that the cerebral vascular accident suffered by Dr. King in December 1977[] first manifested itself on December 8, 1977, after he fell in the snow and immediately experienced numbness in his right upper extremity, lasting for approximately 15-20 minutes.
>
> [I]t is my further opinion that Dr. King's brain injury, which I believe consisted of a deep bleed in the small vessels, later became fully manifest when, on December 9, 1977, Dr. King began to exhibit right facial paralysis, right upper extremity paralysis, weakness and numbness, and related symptomatology.
>
> [I]t is my further opinion that, since Dr. King, did not, prior to December 8, 1977, have any underlying symptoms or signs of an impending stroke, (e.g., blood disorders such as "Factor V," any blood thinning disorder, diabetes, renal insufficiency, congestive heart failure, hypertension, or headaches), Dr. King's brain injury was an unanticipated, sudden, spontaneous vascular accident that, based upon reasonable medical probability, occurred due to

11

a combination of (a). Dr. King's December 8, 1977, neurological-symptoms producing fall in the snow, (b). The very high altitude at which said fall in the snow occurred, and (c). a deep bleed in the small vessels on the left side of Dr. King's brain.

The magistrate judge, who was referred the motion, recommended granting Defendant's motion for summary judgment because (1) the Policy is not ambiguous and (2) there was no genuine issue of material fact as to whether Plaintiff had suffered some external trauma, such as his fall on December 8, 1977, which precipitated his stroke. (*See* Report & Rec. to Grant Def.'s Mot. for Summ. J. at 10-15.) The district court judge adopted that recommendation, granted the summary judgment motion, and dismissed the case. (Dkt. 20, Order Adopting Dkt. 15 Report and Rec. for Dkt. 7, Mot. for Summ. J.)

### B. Sixth Circuit Court of Appeals Reversed and Remanded

Plaintiff appealed to the Sixth Circuit. The court first evaluated what "accidental bodily injury" meant in the context of Plaintiff's disability insurance policy. *King*, 470 F. App'x at 443. The court held that "accidental bodily injury" referred to "physical damage to the body caused by external, violent, unanticipated cause that is neither clearly medical nor biological. *Id.* The court ruled that a stroke was not an "accidental bodily injury" under the policy, despite the fact that the word accident appears in the medical term (cerebrovascular accident). *Id.* Thus, the court found that an accidental bodily injury could only cause Plaintiff's stroke if an "external, violent, unanticipated cause" led to the stroke. *Id.*

Given that holding, the court found a second issue: whether Plaintiff had shown an existence of a genuine issue of material fact as to whether an external, violent, unanticipated cause, such as the fall in the snow, caused Plaintiff's stroke. *Id.* The Sixth Circuit held that there was a genuine issue of material fact. *Id.* at 444-45. The court held

12

that while much of the evidentiary record suggested that for almost 30 years, both parties acted as if Plaintiff's stroke was the result of sickness, the affidavit of Dr. Christopher Sweet, a neuro-radiologist, created a genuine issue of material fact as to whether sickness or accidental bodily injury caused the stroke. *Id.* at 445. The court reasoned that Dr. Sweet's conclusion that Plaintiff's brain injury was caused by "a combination of his "neurological-symptoms producing" fall in the snow on December 8, 1977, the high altitude in Alta, and a "deep bleed in the small vessels on the life side" of King's brain" contradicted Defendant's evidence that Plaintiff's disability was caused by sickness. *Id.* According to the Sixth Circuit, "resolving this dispute [between the evidence was within] the providence of the jury." *Id.*

The Sixth Circuit held that it was improper for the district court to disregard Dr. Sweet's affidavit. *Id.* The court held that Dr. Sweet's affidavit was sufficiently reasoned, not conclusory, and provided enough detail to create an issue of material fact. *Id.* at 446. The Sixth Circuit therefore reversed the district court's judgment and remanded the case for further proceedings. *Id.* at 446.

### c.  Additional Discovery, Second Motion for Summary Judgment

Since remand,[10] the parties have engaged in substantial discovery including issues surrounding both parties' proposed expert testimony. (See Dkt. 43, 51, 52, 54-56, 62-65, 70, 74.) During the discovery period, three individuals gave deposition testimony: Plaintiff

---

[10] The case was reassigned from District Judge John Feikens to District Judge Nancy G. Edmunds pursuant to Administrative Order 10-AO-37. (Apr. 3, 2012 Text Only Notice Reassigning Case.)

Charles King; witness Jon Schriner, and Plaintiff's expert Christopher Sweet.[11] Dr. Sweet also submitted a supplemental affidavit, and Defendant supplied a disclosure of expert testimony by Philip B. Gorelick, M.D.[12]

### III.    Rule 56 Summary Judgment Standard of Review

1"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;

---

[11] (*See* Def.'s 2d Mot. for Summ. J., Ex. B, King Dep.; *Id.,* Ex. K, Schriner Dep.; *Id.,* Ex. L, Sweet Dep.)

[12] *Id.,* Ex. N, Supp. Aff. of Christopher Sweet; *Id.,* Ex. O, Def.'s Disclosure of Expert Test.)

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

IV. **Analysis**

Defendant argues that: (1) Plaintiff has not put forth enough evidence to show that Plaintiff's stoke was caused by an "external, violent, unanticipated cause;" and (2) the applicable statute of limitations bars Plaintiff's claim for continued disability payments.

Plaintiff argues that: (1) summary judgment is improper because the testimony from the three depositions shows that Plaintiff's stroke was preceded by the injury Plaintiff sustained when he fell in the snow hitting his head; and (2) his complaint for breach of contract is not barred by either the statute of limitations or the doctrine of laches.

Defendant responds that: (1) Defendant's defense of laches is not time barred; (2) Plaintiff's expert Dr. Sweet contradicted himself and agreed with Defendant's expert; and (3) Plaintiff ignores the testimony of Dr. Schriner, who testified that at the time of the incident that Plaintiff's doctor told him that the cause of the stroke was an aneurysm.

The parties spend the majority of their arguments on how there is/is not a material issue of fact concerning whether an accidental bodily injury or sickness caused Plaintiff's total disability. Given the parties' arguments, the Court finds that they have amply demonstrated that an issue of material fact exists as to the cause of Plaintiff's injury. The Court, though, before it reaches the injury argument, must address Defendant's statute of limitations defense. The parties dispute both whether Defendant may properly raise the argument now and, if Defendant may properly assert the defense, when Plaintiff's claim accrued. The Court finds that, following Michigan law, Defendant has waived its statute of limitations defense because it failed to plead facts in support of its defense in its answer and because Defendant did not assert the defense in its first motion for summary judgment.

### A.    Defendant Has Waived Its Statute of Limitations Argument

Defendant argues that Michigan's six-year breach of contract statute of limitations bars Plaintiff's claim.[13]  (Def.'s 2d Mot. for Summ. J. at 13-14.) Defendant argues that it still has the ability to assert the statute of limitations argument, even after four and a half years have passed in this case

---

[13] Michigan law determines whether a defendant has waived a statute of limitations argument. *Tangradi v. Baptist Mem'l Hosp. of Union City*, 10-0115, 2012 WL 2681806, at *11 (W.D.Tenn.) (citing *Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1294 (6th Cir. 1974) (applying state law to determine when a party waives a statute of limitations claims.).

Plaintiff argues that Defendant waived its ability to raise the defense. (Pl.'s 2d Resp. at 17.)

The Court agrees with Plaintiff—in Michigan, a defendant must state facts supporting its statute of limitations defense in its answer. If the defendant fails to do so, it waives its statute of limitations defense. Here, Defendant conclusorily stated "statute of limitations" in its answer—that blanket statement, the Court finds, in connection with Defendant's failure to assert the defense in its first motion for summary judgment, constitutes a waiver of the defense.

"Affirmative defenses, such as expiration of the period of limitation, must be raised in a party's responsive pleading and must be supported by factual allegations." *Horvath v. Delida*, 540 N.W.2d 760, 764 (Mich.Ct.App. 1995) (Michigan court rule citations omitted). "The party asserting an affirmative defense has the burden to produce evidence to support it; only after such evidence has been introduced does the burden shift to the plaintiff to produce 'clear and decisive evidence to negate' the defense." (citations omitted). Under Michigan Court Rule 2.111(F)(3), a party must state an affirmative defense under a separate heading and must include the facts constituting the defense. *Department of Envtl. Quality v. Bulk Petroleum Corp.*, 741 N.W.2d 857, 864 (Mich.Ct.App. 2007). A party can waive a statute of limitations affirmative defense. *Id.* (citation omitted). "Such a waiver may be shown by a course of acts and conduct, and in some cases will be implied therefrom." *Id.* (citations and internal quotations marks omitted).

17

Here, Defendant waived its statute of limitations argument by failing to support its defense with facts in its answer and by its course of conduct—failing to raise the defense in its first motion for summary judgment, well before the first discovery period ended.

*Department of Environmental Quality v. Bulk Petroleum Corp.*, 741 N.W.2d 857 (Mich.Ct.App. 2007) is persuasive.  In *Bulk Petroleum*, the plaintiff argued that the defendants waived their statute of limitations argument because they did not properly plead the defense and did not raise the argument in response to the plaintiff's motion for summary disposition. 741 N.W.2d at 864.  There, the defendants, in their answer, asserted "Statute of Limitations" as an affirmative defense.  *Id.*  But the court pointed out that the defendants "failed to provide any facts supporting [a statute of limitations] affirmative defense or cite a specific, applicable statute of limitations." *Id.*  The court also found fault with the defendants' "failure to raise their statute of limitations defense in response to [the] plaintiff's motion for summary disposition." *Id.* at 865.  The court noted that the defendants made "no reference to any statute of limitations as an affirmative defense to plaintiff's claims," in their response brief.  *Id.*

Here, as in *Bulk Petroleum*, Defendant conclusorily stated "statute of limitations," in its answer with no supporting facts.  Defendant also did not even cite the appropriate breach of contract statute of limitations.  That failure, alone, the Court finds, warrants a finding of waiver.  But Defendant also did not assert the statute of limitations defense in its motion for summary judgment.  At no time in the pleadings and through the appeals

18

process, did Defendant raise the issue.[14]  Through this course of conduct, Defendant also waived its statute of limitations argument.

In *Horvath v. Delida*, 540 N.W.2d 760 (Mich.Ct.App. 1995), the court also addressed whether the defendant waived its statute of limitations defense, but with a different outcome than in *Bulk Petroleum*.  There, the defendant did include "statute of limitations" as an affirmative defense in its answer and amended answer and stated that the plaintiffs' "claim is barred because of the statute of limitations applicable to the state cause of action."  *Id.* at 764.  The court noted that the plaintiffs, in their depositions, "alleged specific damages regarding flooding of their land [in a time period that the statute of limitations would bar.]" *Id*.  The court pointed out that, despite uncovering facts that would have barred the plaintiffs' claim, the defendants failed to assert a statute of limitations defense on the motion for summary disposition.

The court noted Michigan's law regarding affirmative defenses.  *Horvath*, 540 N.W.2d at 764.  The court then distinguished its case from a Michigan supreme court case, *Palenkas v. Beaumont Hospital*, 443 N.W.2d 341 (1989).  The court stated that, in *Palenkas*, "the defendant failed to include factual allegations in its answer to support its affirmative defense under the statute of limitations, failed to move before trial for an accelerated judgment, failed to submit an affidavit or other evidence before trial to rebut the plaintiff's allegation regarding the accrual date of his cause of action . . . and failed to

---

[14] The Court notes that the Sixth Circuit looks unfavorably on, and rarely considers, arguments raised for the first time on appeal.  *See See In re Settlement Facility Dow Corning Trust*, 11-2632, 2013 WL 870247, at *10 (6th Cir. Mar. 8, 2013) (quoting *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir. 1993) ("This court does not normally address issues raised for the first time on appeal.").

present any evidence regarding the statute of limitations issue in its case in chief." *Id.* at 764 (citation omitted).   The court further stated that the *Palenkas* court held that the defendant's motion for accelerated judgment, "brought at the close of the plaintiff's proof, was untimely and without adequate factual support in the record[.]" *Id.* (citations omitted).

 The *Palenkas* court therefore found that its defendant waived its ability to raise the statute of limitations defense.

The *Horvath* court recognized that the procedural facts of its case and *Palenkas* were similar.  540 N.W.2d at 764.  But the *Horvarth* court noted the difference between the cases, that in its case the "plaintiffs' own testimony at deposition and at trial exposed the fatal defect in their cause of action." *Id.*  The court further noted that there were no factual disputes in its case that the plaintiffs had notice of its cause of action and should have filed suit earlier, whereas *Palenkas* focused on the lack of evidentiary support for the statute of limitations defense and the factual disputes.  *Id.*

The *Horvath* court did admonish the defendant:

> Such a motion [to dismiss before trial on the statute of limitations basis] would have promoted judicial economy and avoided expensive litigation for both parties.  However, [the] defendants' failure to seek pretrial dismissal of [the] plaintiffs' cause of action does not alone warrant a conclusion that [the] defendants abandoned their affirmative defense based on expiration of the period of limitation.  The underlying rationale for requiring a party to provide factual support for affirmative defenses is to prevent the adverse party from being taken by surprise at trial.

540 N.W.2d at 764-65 (citations omitted).  But the court permitted the defendant to assert the statute of limitations argument and prevail on that argument.  *Id.* at 765.

Here, the Court finds that Defendant has waived its statute of limitations defense. While not completely analogous to either *Bulk Petroleum*, *Horvath*, or *Palenkas*, the Court

finds that, under Michigan law, Defendant cannot now assert its defense.  *See also Griggs*

*v. Hamilton*, 309133, 2013 WL 2228066, at*4, n. 1 (Mich.Ct.App. May 21, 2013) (holding

that the defendant did not give notice of her statute of limitations defense, and therefore,

she waived it.).  The Court first notes that Defendant's answer insufficiently asserts a

statute of limitations defense.  Defendant provided no supporting facts in its answer,

despite having all the facts it needed to support and raise the defense at the time of filing

its answer.  Defendant also did not raise the defense in its motion for summary judgment,

despite, again, having all the facts and documentation necessary to assert the defense.

Given those opportunities and failures, the Court finds that Defendant has waived its ability

to assert its statute of limitations defense.

### B.    Defendant Cannot Assert Its Laches Defense

Defendant also asserts that laches bars Plaintiff's claims.  (Def.'s 2d Mot. for Summ.

J. at 15-17.)  Plaintiff argues that laches is inappropriate here.  (Pl.'s 2d Resp. at 19.)

Plaintiff also argues that Defendant has laches on its laches argument.[15]

---

[15] Laches cannot bar a statute of limitations defense.  In *Nelski v. Ameritech*, 273728, 2007 WL 1376349, at *5 (Mich.Ct.App. May 10, 2007), the plaintiff claimed that laches precluded the defendant's assertion of a statue of limitations defense, because the defendants failed to raise the statue of limitations argument in their first motion for summary judgment.   The court stated that "[l]aches is generally viewed as an equitable affirmative defense that is primarily applicable where circumstances make it inequitable to grant relief to a plaintiff who unreasonably delays filing a claim." *Id.* (citation omitted).  The court found that the plaintiff cited "no Michigan law holding that the doctrine of laches may be utilized to preclude the use of an affirmative defense." *Id.*  The court stated that a party "may not merely announce his position and leave it to the court to discover and rationalize the basis for his claims . . . nor may he give issues cursory treatment with little or no citation of supporting authority." *Id.* (citations omitted).

"Laches is an equitable tool used to provide a remedy for the inconvenience resulting from the plaintiff's delay in asserting a legal right that was practicable to assert." *Knight v. Northpointe Bank*, 832 N.W.2d 439, 442 (Mich.Ct.App. 2013) (citations omitted). But, while the passage of time is important, "laches is not triggered by the passage of time alone." *Id.* (citation omitted). "It is the prejudice occasioned by the delay that justifies the application of laches." *Id.*

Here, for many of the same discussed above, the Court finds that Defendant cannot assert its laches argument. "[L]aches is viewed as the equitable counterpart to the statute of limitations." *Tenneco, Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 863-64 (Mich.Ct.App. 2008). The Court sees no reason that its discussion above would not also cover Defendant's laches argument. Defendant has waived the defense.[16]

**C.   An issue of fact exists as to whether an external, violent, unanticipated incident caused Plaintiff's total disability**

---

[16] The Court notes Defendant's prejudice arguments. Defendant states that Plaintiff's thirty-year delay has made it impossible for Defendant to have the proper discovery—Defendant states that "hospital records are gone, the key 1977 angiogram is missing, witnesses are either unknown or their memories have faded, and [Defendant] is unable to fully investigate and uncover what happened back on the slopes of Alta in 1977." (Def.'s 2d Mot. for Summ. J. at 16.) Defendant also argues that it did not assume Plaintiff's claims until years after Plaintiff's initial claim with Mass Life. (*Id.*) Defendant further argues that Plaintiff had "multiple opportunities" to assert a claim for "accidental bodily injury," but chose not to do so. (*Id.* at 17.) The Court acknowledges that these defenses may have been valid ones, but the Court finds that Defendant waived this argument as it did its statute of limitations argument. The Court further acknowledges that "the question of prejudice is generally a question of fact," but a court may decide the issue as a matter of law "when only one conclusion can be drawn from the undisputed facts." *Tenneco*, 761 N.W.2d at 849 (citation omitted). The Court also notes, though, that a Mass Life representative reviewing Plaintiff's file, stated that the issue of sickness versus accidental bodily injury would not be ripe until 2006.

An issue of fact exists as to whether an external, violent, unanticipated incident caused Plaintiff's total disability.  The Sixth Circuit, in its order reversing the first order, stated that an issue of material fact existed for the jury to decide.  The Sixth Circuit noted that the parties' proposed experts' affidavits created this issue of fact.

Here, again, the Court faces competing affidavits.

Plaintiff has submitted Dr. Christopher Sweet's affidavit to support his argument that an accidental bodily injury caused Plaintiff's stroke.  (Def.'s 2d Mot. for Summ. J., Ex. N, Sweet Supplemental Aff.)  Dr. Sweet, a radiologist who specializes in neuroradiology concluded that Plaintiff's "cerebral vascular accident" first manifested itself in Plaintiff immediately after Plaintiff fell in the snow.  (*Id.* ¶¶ 2, 5.)  Dr. Sweet noted that Plaintiff experienced numbness in his right upper extremity immediately after the fall and that numbness lasted fifteen to twenty minutes.  (*Id.* ¶ 5.)  Dr. Sweet stated that Plaintiff's brain injury fully manifested itself the day after the accident when Plaintiff "began to exhibit right facial paralysis, right upper extremity paralysis, weakness and numbness, and related symptomatology."  (*Id.* ¶ 6.)  Dr. Sweet offered that Plaintiff, prior to December 8, 1977, did not have any "underlying symptoms or signs of an impending stroke[.]"  (*Id.* ¶ 7.)  Dr. Sweet concluded that Plaintiff's "brain injury was an unanticipated, sudden, spontaneous vascular accident that, based upon reasonable medical probability, occurred due to a combination of (a) [Plaintiff's fall,] (b). The very high altitude at which said fall in the snow occurred, and (c). [A] deep bleed in the small vessels on the left of [Plaintiff's] brain."  (*Id.*)

Defendant has submitted proposed expert testimony. (Def.'s 2d Mot. for Summ. J., Ex. O, Disclosure of Expert Testimony.)  Defendant submits Dr.  Philip B. Gorelick's

23

proposed testimony.  Dr. Gorelick concludes that an accidental bodily injury did not cause Plaintiff's stroke.  (*Id.* ¶ 1.)  Dr. Gorelick explains that he formed his conclusion by relying on all the facts and data submitted.  Dr. Gorelick offers that, if an accidental bodily injury caused Plaintiff's stroke, he "would expect to see evidence of skull fracture" and "contusions on or about the head" and possible "brain swelling."  (*Id.*)  Dr. Gorelick maintains that Plaintiff's cerebral angiogram taken at St. Mark's Hospital following the stroke "was normal."  (*Id.* ¶ 2.)  Dr. Gorelick states that "no dissection of an artery in the brain was found," which he adds he would have expected if "an external violent unanticipated cause" caused Plaintiff's stroke.  (*Id.*)  Dr. Gorelick further states that the "medical records following [Plaintiff's] stroke further reflected no evidence of physical damage to the body caused by an external, violent, unanticipated cause that is neither clearly medical nor biological."  (*Id.* ¶ 3.)  He then offers that Plaintiff's pre-1977 medical records showed that he had a family history of stroke.  (*Id.* ¶ 4.)  He also suggests that the records reflected that Plaintiff "may have had a congenital cerebral arteriovenous malformation . . . making him susceptible to a spontaneous hemorrhage unrelated to accidental bodily injury."  (*Id.*)  Dr. Gorelick concludes that Plaintiff's stroke "was consistent with a spontaneous bleed in the brain unrelated to accidental bodily injury."  (*Id.* ¶ 5.)

Defendant argues that Dr. Sweet has offered conflicting statements.  (Def.'s 2d Reply at 6.)  While that may be the case, a jury is to reconcile conflicts in statements and testimony and decide what weight to give to an expert.  *See First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (quoting that "the jury was free to give [an expert's] testimony as much credence as it felt the testimony deserved, particularly in

light of [the defendant's] cross-examination exposing [the expert's] lack of familiarity with the given topics.") (citations omitted, first insertion in *Barreto.*).  Here, viewing the evidence in a light most favorable to Plaintiff, the Court finds, taking its cue from the Sixth Circuit, that there is a material issue of fact as to what caused Plaintiff's injury.  The jury is to decide that question.  Whatever problems Defendant has with Dr. Sweet's opinion, Defendant can properly expose at trial.

v.    **Conclusion**

For the above-stated reasons, the Court DENIES Defendant's motion.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 6, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 6, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol Hemeyer

25